WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

George Rudebusch, et al.,       )
                                )
              Plaintiffs,        )       No. CIV 95-1313-PCT RCB and
                                )       No. CIV 96-1077-PCT RCB
         Vs.                     )                O R D E R
                                )
State of Arizona, et al.,       )
                                )
              Defendants.        )
_____)

**I.   Procedural Background**

On June 30, 1995, Plaintiffs George Rudebusch, et al., filed the first of two now-consolidated cases, CIV 95-1313-PCT RCB. Complaint (doc. 1).  Thereafter, on May 2, 1996, a complaint was filed in a related action, CIV 96-1077-PCT RCB.  Complaint (doc. 1).  The court granted Plaintiffs' motion to consolidate these cases on November 1, 1996.

On December 12, 2000, this case proceeded to a jury trial (Minute Entry (doc. 233)) in which evidence was considered over the course of four days.  Id. at 233-37.  On December 18, 2000, the jury rendered its verdict in Defendants' favor, and judgment was

1  entered thereon on December 29, 2000.  See doc.'s 241, 248.

2      On January 24, 2001, Plaintiffs filed their notice of appeal.

3  Notice (doc. 250).  On December 18, 2003, the Ninth Circuit Court

4  of Appeals issued a mandate which affirmed in part, reversed in

5  part, and remanded the case to this court for additional

6  proceedings.  Mandate (doc. 259).  The sole issue remaining for

7  determination upon remand is whether certain Defendants can be held

8  liable under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §

9  2000 et seq.  Id. at 32.

10     At a pre-trial conference held on December 19, 2003, the

11 parties stipulated to try the remaining issues on remand to this

12 court, as opposed to a jury, at a trial which would commence on

13 January 6, 2004.  Minute Entry (doc. 267).  Also on December 19,

14 2003, the parties stipulated that, for purposes of the January 6,

15 2004 trial, the court would determine the issue of "liability"

16 under Title VII only, and that if a determination of liability is

17 made, "the court will set a later trial date and will grant the

18 parties an opportunity to conduct additional discovery" as to the

19 question of damages.  Order (doc. 268) at 3.

20     On January 6, 2004, the court conducted the trial as to the

21 issue of Title VII liability as ordered in the Ninth Circuit's

22 mandate.  Minute Entry (doc. 269).  On June 30, 2004, the Court

23 issued its findings of fact and conclusions of law on this matter,

24 finding that liability for Defendants' violation of Title VII had

25 been established.  Order (doc. 277).  However, the Court noted that

26 damages in relation to this violation are a factual issue that the

27 parties stipulated would be presented at a later trial after

28 additional discovery was taken.  Id. at 20.  Such discovery is now

complete.

On September 28, 2005, Defendants filed a motion for summary judgment on the issue of damages. Mot. (doc. 16). Thereafter, Plaintiffs filed their response to this motion, as well as a cross-motion for summary judgment. Cross Mot. (doc. 305). These motions were fully briefed on January 23, 2006. P. Reply (doc. 315). The court, having carefully considered the arguments presented by the parties, now rules.

**II.  Overview of Case**

In order to provide a general factual background for the present inquiry, the court adopts the Ninth Circuit's overview of this case, as contained in its mandate (doc. 259, at 7-11; <u>see also</u>, <u>Rudebusch v. Hughes</u>, 313 F.3d 506 (9th Cir. 2002)):

At the time of this action, Northern Arizona University ("NAU" or "the University") was the recipient of significant federal funding and thus subject to federal regulations requiring it to implement an affirmative action plan. The plan adopted by the University, and approved by the federal government's Office of Federal Contract Compliance Programs, broadly mandated an increase in the recruitment and retention of minority faculty, as well as an assurance of parity between men and women in all areas of employment.

In terms of pay equity, the plan required the University to evaluate all employees' compensation annually for purposes of gender equity and minority integration, and at least with respect to salary inequities attributable to gender, the University was required to remedy such disparities within one year of their identification. The ultimate responsibility for assessment of

disparities fell to Dr. Eugene Hughes, NAU's president.

By 1989, six of 133 full professors were women (up from three in 1985), and thirty-four of 188 associate professors were women (up from eighteen in 1985).  The majority of female faculty occupied the lowest ranks of assistant professors, and even there they were far out-numbered by male faculty.

Five out of 53 faculty openings during this same time period were filled by minorities.  And despite recruitment goals set for minority hiring in later years, NAU reported to the federal government in 1993 that it had lost twice as many minority faculty as it had hired during the 1991-1992 academic year.  In fact, the University had lost over a quarter of its minority faculty in the two years preceding the pay adjustments – despite new hires.

Upon review of available statistics, Hughes concluded not only that there was a hiring disparity, but that overall pay inequity was also apparent.  In 1989, female faculty were making on average over $8,000 a year less than male faculty.  Minority faculty did not fare much better.  The University's 1988 annual study noted that their mean salary was over $6,700 less than that of non-minority faculty.

These disparities prompted Hughes to conclude that some form of corrective action was necessary as early as 1990.  That same year, the Arizona legislature allocated funds to NAU for general "market adjustments" to faculty salaries (i.e., adjustments ostensibly intended to make the University's salaries competitive with those of other schools).  Department heads at the University were entrusted with making recommendations for individual adjustments.  Hughes observed that these adjustments did not

1  alleviate existing sex and race-based pay disparities, an

2  observation that was confirmed by subsequent annual pay studies.

3      Hughes and NAU were not the only ones with concerns about pay

4  disparity.  Around the same time, the Arizona Board of Regents

5  established the Commission on the Status of Women to report on this

6  issue with regard to female faculty at the State's three

7  universities.  In 1991, the Commission published a study that

8  included many of the above findings about female faculty employment

9  between 1985 and 1989.

10      The Commission concluded that the absolute differences in pay

11  "were quite large."  Although some disparity could be attributed to

12  "the clustering of women at the lower professional ranks and their

13  overrepresentation within disciplines that have lower salaries on

14  the national market," the Commission concluded that even "[w]hen

15  rank was controlled, the differences were still substantial."

16  Additionally, the Commission noted that making adjustments for rank

17  may be problematic since "rank is itself affected by a faculty

18  member's sex.  If it were the case that male faculty are more

19  likely to be promoted than female, controlling for rank in the

20  analysis would result in underestimating salary inequities."

21      Close to the heels of the Commission's study was NAU's own

22  1993 annual equity report ("Chambers' report"), authored by the

23  head of its office of institutional research, Dr. Stephen Chambers.

24  Chambers had been producing these reports for the University since

25  1986.  As he explained at trial, the regression analysis Chambers

26  employed was similar to the model used by hundreds of institutions

27  across the United States.

28      In this context, regression analysis is a statistical

application used to predict how salary (the dependent variable) should vary based on rank, years of service, discipline and the like (considered independent variables).  The regression model isolates the likelihood that factors other than legitimate differences such as rank, i.e., factors such as discrimination, play a role in the salary disparities.  The likelihood is determined by predicting what the salary should be given the legitimate factors, and measuring the difference to the actual salary (in standard deviations).

Based on this time tested analysis, the Chambers' report concluded that there were "statistical differences in gender and ethnic equity" which could be removed with $278,966 in adjustments. The report ultimately recommended various adjustments for 72% of the female faculty.  A majority of the adjustments were in the $1,001 to $3,000 per year range.  The amount of each adjustment depended on how far an individual's salary fell below the predicted salary of a similarly situated white male professor.  The women who were at or above this predicted salary received no adjustment.

Using the same benchmark as that used for female adjustments – the predicted salary of a similarly situated white male professor – the report recommended adjustments ranging from $250 to $6,945 for about half of the minority male faculty.  The majority of the adjustments were in the $2,001 to $3,000 range.

Considering the findings of the 1993 equity report and the 1991 study on the status of women, as well as the requirements of the University's affirmative action plan, Hughes testified that he felt compelled to take remedial action in mid-1993.  According to Hughes, the "usual process" of making salary adjustments involved

recommendations and consultation with department chairs, deans, and the academic vice president, but because "that hadn't worked on other occasions," Hughes decided, with some modification, to adopt and implement the adjustments recommended in Chambers' 1993 report.

Hughes did not simply accept the report as prepared.  Rather, Hughes undertook an administrative review of the proposed adjustments and asked Chambers to run additional regression analyses before settling on the final adjustments.  In order to achieve the goal of attaining pay equity, Hughes used $207,613 of unappropriated funds (from among other sources, salaries appropriated for vacant faculty positions) in the school's existing budget to make the necessary adjustments ("1993 adjustments").

Salary adjustments were awarded to female and minority male faculty whose actual salary fell below the predicted salary of a similarly situat[ed] non-minority male.  Women and minority men who were already earning their predicted salary or more did not receive any adjustments, nor did any non-minority men receive adjustments, even those whose earnings were below the predicted salary.

Sometime after Hughes instituted the salary adjustments, and also after he had left his post at the University, NAU hired two outside consultants, Donald Gantz and John Miller, to do a study on the adjustments.  The Gantz/Miller study criticized several aspects of Chambers' methodology.  Nevertheless, even Gantz/Miller's preferred method of analysis would have led to adjustments for 93 male minority professors totaling $164,410.  The only question for Gantz/Miller was whether such adjustments would be "required."  The study concluded that they were not.  This finding resulted not because Gantz/Miller were unable to ascertain any unexplainable

1  differences in pay – they in fact found a disparity for both women

2  and for minorities – but because they concluded that these

3  disparities were not statistically significant enough (that is,

4  large enough) to prove that the "inequity [was] due to either

5  gender or minority status."

6      This Court notes that, in 1994, Hughes' successor, Dr. Clara

7  Lovett, granted certain retroactive salary adjustments ("1994

8  adjustments").  Mot. (doc. 16) at 8.  The total amount allocated to

9  the retroactive increases was approximately $693,000.  Id.  Through

10  these adjustments, each Plaintiff received at least an increase of

11  $1240, with several receiving a larger sum.  Id.

12      **b.  Issues Considered at January 6, 2004 Trial**

13      Plaintiffs originally brought various claims for relief in the

14  present case.  After the jury found for Defendants, and a judgment

15  was entered dismissing the case, Plaintiffs appealed.  While the

16  Ninth Circuit affirmed as to all other issues, it determined that

17  this court's prior grant of summary judgment in Defendants' favor

18  concerning Plaintiffs' Title VII claim was improper.  Mandate (doc.

19  259) at 32.  Thus, the only issue before the court at the January

20  6, 2004 Trial was whether the 1993 adjustment was designed "to

21  eliminate a manifest racial (or gender based) imbalance."  Id. at

22  29, quoting United Steelworkers of America, AFL-CIO-CLC v. Weber,

23  443 U.S. 193, 208 (1979).  The Court determined that liability for

24  Defendants' violation of Title VII was established, because

25  Defendants' actions impermissibly went beyond "attain[ing] a

26  balance."  Order (doc. 277) at 20.

27      **c.  Damages Issue**

28      Having found liability, the next stage of these proceedings

requires the Court to consider the question of damages under Title VII.  The Court, in its June 30, 2004 Order, stated that "[t]he most obvious question that must be answered by the parties at that stage is whether the 1994 raises ordered by Dr. Lovett (amounting to approximately $693,000) successfully mitigated the inequity created by the 1993 Hughes adjustments."  Order (doc. 277) at 20. The Court advised the parties that, "[i]n analyzing damages, to the extent future regression analyses are undertaken, consideration should be given not only to the factors used by Chambers, but also factors that may more fully explain the existence of salary differences such as doctoral status, performance and individual difference."  Id. at 20-21.  In any event, Plaintiffs retain the burden to establish the damages they have suffered.  Id. at 21.

III. Summary Judgment Standard

To grant summary judgment, the Court must determine that the record before it contains "no genuine issue as to any material fact" and, thus, "that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  In determining whether to grant summary judgment, the Court will view the facts and inferences from these facts in the light most favorable to the nonmoving party.  See Matsushita Elec. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  A material fact is any factual dispute that might affect the outcome of the case under the governing

1  substantive law.  Id. at 248.  A factual dispute is genuine if the
2  evidence is such that a reasonable jury could resolve the dispute
3  in favor of the nonmoving party.  Id.

4      A party opposing a motion for summary judgment cannot rest
5  upon mere allegations or denials in the pleadings or papers, but
6  instead must set forth specific facts demonstrating a genuine issue
7  for trial.  See id. at 250.  Finally, if the nonmoving party's
8  evidence is merely colorable or is not significantly probative, a
9  court may grant summary judgment.  See, e.g., California
10 Architectural Build. Prods., Inc. v. Franciscan Ceramics, 818 F.2d
11 1466, 1468 (9th Cir. 1987).

12 **IV. Discussion**

13     **a. Defendants' Motion for Summary Judgment**

14     In determining an appropriate remedy under Title VII, the
15 Court must attempt to place the Plaintiff in the position he or she
16 would have occupied but for the discrimination.  See Albemarle
17 Paper Co. v. Moody, 422 U.S. 405, 421 (1975).  Title VII provides
18 for recovery of back pay. 42 U.S.C. § 2000e-5(g). However, back pay
19 is not an automatic or mandatory remedy, but rather one that the
20 Court may invoke.  Albemarle, 422 U.S. at 415.  Congress intended
21 that the courts use Title VII's remedial provisions to make
22 discrimination victims whole.  Id. at 418.  Damage calculations
23 should be designed to estimate the difference between what the
24 aggrieved party earned and what they would have earned but for the
25 discrimination.  See Domingo v. New England Fish Co., 727 F.2d
26 1429, 1444 (9th Cir. 1984).

27     In their motion for summary judgment, Defendants assert, and
28 Plaintiffs do not dispute, that Plaintiffs seek damages under the

theory that they are entitled to a retroactive and prospective salary increase to their salaries predicted in the Chambers' report.  Mot. (doc. 16) at 4.  Plaintiffs produced the report of Dr. Robert Toutkoushian, Ph.D., an expert in conducting and using regression analysis to determine faculty salary equity.  Id.  In his report, Toutkoushian calculated Plaintiffs' damages based on the assumption that they should have received their 1993 predicted salaries, predicted in the Chambers' report.  Id.

Defendants challenge this theory of Plaintiffs' damages, arguing that it promulgates discrimination against female faculty and makes Plaintiffs better off than they would have been had no discrimination ever occurred.  Id. at 1-2, 5-7.  "Here, the Plaintiffs are arguably entitled to the increase, if any, they would have received if NAU had allocated the $207,000 in 1993 affirmative action pay increases to 'attain a balance.'"  Mot. (doc. 16) at 7.  Additionally, Defendants assert that NAU has already paid Plaintiffs increases that make them better (or no worse) off then they would have been in the absence of discrimination.  Id. at 2.  Defendants ask the Court to find that Plaintiffs are not entitled to retroactive and prospective salary increases to the 1993 predicted salaries, and that NAU has already granted Plaintiffs an equitable back pay remedy.  Id. at 11.  Alternatively, at a minimum, Defendants ask the Court to find that Plaintiffs may not base their damages calculation on the Chambers' report.  Id. at 7.

First, Defendants argue that the Court should deny Plaintiffs' request for damages, because their request is inappropriately based on the Chambers' report.  At the outset, Defendants assert that

Plaintiffs' damages calculation is inappropriate, because their request "promulgate[s] additional discrimination against female faculty, obviously erasing any appropriate measure of affirmative action." Id. at 5.  Defendants contend that if the Court grants Plaintiffs' request, the result will be that the Plaintiffs will receive a salary that is $1206 or $1207 higher than if they had been female.[1]  Mot. (doc. 16) at 5.  Such a result, Defendants argue, would discriminate against female faculty and completely erase any appropriate affirmative action from the 1993 increases. Id.

> Simply put, a remedy designed to fix an affirmative action plan on behalf of females, that places males at an additional advantage over females, does not achieve equity.

Id.

Additionally, Defendants argue that the proposed remedy would place Plaintiffs in a far better position than they could have been if NAU had "distributed the 1993 equity funds in a manner designed to attain balance." Id. at 7.  Lastly, Defendants maintain that it makes no sense to fashion Plaintiffs' remedy on the very study that Plaintiffs previously condemned.  Id.

Second, Defendants argue that Plaintiffs are not entitled to any damages, because NAU already provided them an equitable remedy by retrospectively granting them an increase of $1240 or more, dating back to the effective date of the 1993 equity increases.

---

[1] Defendants assert, and Plaintiffs do not dispute, that the predicted salaries in the Chambers' report consistently discriminated against women in the amount of $1206 or $1207 due to the $1207 co-efficient for gender included in the analysis. DFSOF (doc. 17) at ¶ 10; P. Resp. (doc. 305) at 6.

1  Mot. (doc. 16) at 8.  Defendants contend that "[t]he 1994 increases

2  constitute an equitable remedy because they leave a more measured

3  version of affirmative action in place, while individually

4  addressing inequities within departments."  Id.  Moreover,

5  Defendants note that the Grantz and Miller report indicates that

6  they found no "systematic inequities in salary level between males

7  and females or between majority and minority class members."  Id.

8  at 10. Defendants note that Plaintiffs have not produced any

9  regression analysis that shows otherwise.  Id.  Lastly, Defendants

10  point to the EEOC's letter to Plaintiff Rudebusch that explains its

11  determination that the 1994 salary adjustments "constituted

12  essentially what the aggrieved parties could obtain if they filed a

13  lawsuit under Title VII[.]"  Id., citing Exbt. 8 (doc. 17).

14  Defendants encourage the Court to consider the EEOC's conclusion as

15  highly probative evidence that the 1994 increases constituted

16  appropriate equitable back pay relief.  Mot. (doc. 16) at 10.

17      In response to these arguments, Plaintiffs assert that the

18  damages they request are appropriate.  P. Resp. (doc. 305).  First,

19  although Plaintiffs do not dispute that their damage theory would

20  not resolve the pay disparity for the affected female faculty at

21  NAU, they argue that they "should not be punished for the female

22  faculty members' failure to pursue relief under Title VII."  Id. at

23  4.

24          It is unfortunate that only forty members of the
           class filed a complaint under Title VII and enjoy
25         the higher standard of legal protection it
           provides.  But it is inexcusable sophistry to
26         argue that remedying a part of the discrimination
           against the class members promulgates additional
27         discrimination against the remaining unprotected
           members[.]

28

1    Id. at 8.  Additionally, Plaintiffs contend that, although the

2    Chambers' report was flawed, using the pay raises determined by

3    that analysis is reasonable to correct the inequity.   Id.

4    Plaintiffs note that the EEOC compliance manual states that "the

5    remedy should include a salary increase and back pay in the amount

6    of the unlawful difference between the wages of the lower and

7    higher paid comparator(s)."   Id.

8       Second, Plaintiffs assert that the 1994 salary adjustments did

9    not successfully mitigate the inequity created by the 1993

10   adjustments.  P. Resp. (doc. 305) at 10.   In support of this

11   statement, Plaintiffs note that Plaintiff Hood's salary, even after

12   the 1994 adjustment, still lagged behind the salary of faculty

13   member A.F. Lee, who was a minority faculty member in the

14   Mathematics department.   Id. at 11; D. Reply & Resp. (doc. 21) at

15   6.

16          ...Lovett's 1994 increase to Hood of $2146, to a
            salary of $35146, reduced the amount of the
17          discrimination suffered by Hood relative to
            Lee...to...$1207. *But Lovett's same 1994*
18          *adjustment gave an additional $887 to the minority*
            *male Lee, raising him to a salary of $37240.*   Thus
19          Lovett's 1994 adjustment *increases* the amount of
            discrimination suffered by...Hood...*from $1207 to*
20          *$2094.* Additionally, three other Plaintiffs (Funk,
            Jackson, and Riskin) share exactly the same codes
21          as Hood and Lee[.]...In addition, Plaintiffs Huck,
            Porter, and Johnson share the same market value
22          and rank as the minority male Lee, but have *even*
            *more* experience and in Johnson's case *much more*
23          experience than minority male Lee. None of these
            Plaintiffs were raised to the same level as Lee.
24

25   P. Resp. (doc. 305) at 11.  Plaintiffs specifically focus their

26   argument around the contention that each of them lagged behind

27   their 1993 predicted salaries after the 1994 retroactive

28   adjustments.   Id.

It is undisputed that the 1994 adjustments granted a presumptive increase of $1240 to all non-minority males in departments where females or minorities received the 1993 increases.  DFSOF (doc. 17) at ¶¶ 22-25.  Moreover, it is uncontested that the 1994 adjustments considered the department in which a non-minority faculty member taught.  D. Reply & Resp. (doc. 21) at 6-7; DFSOF (doc. 17) at ¶¶ 23, 29-34.  For example, a non-minority faculty member received at least a $1240 increase in his salary.  DFSOF (doc. 17) at ¶¶ 22-25.  If, however, even after the 1994 increase was instilled, the salary of a non-minority faculty member was still below that of a comparator within his same department, the non-minority faculty member received an additional salary increase to equal that of his comparator.  Id. at ¶¶ 23, 29-34.

Thus, Defendants explain Lee's additional increase in 1994 by the fact that, after Professor Swift, a non-minority comparator within the same department as Lee, received the 1994 adjustment, Defendant had to further raise Lee's salary in order to make it equal with Swift's new salary.  D. Reply & Resp. (doc. 21) at 6.  Plaintiff Hood, the party Plaintiffs use in their salary comparison to show the existence of continued pay inequity after the 1994 adjustments, was, admittedly, not a faculty member within the same department as Lee. Id. at 7; P. Resp. (doc. 305) at 19.  Defendants note that Professor Hood received $2146 through the 1994 adjustment due to salary equity issues within *his department*, Modern Languages.  D. Reply & Resp. (doc. 21) at 6-7.

Although the parties seem to agree upon the definition of "comparator" in this matter, they do not use it as a reference

point within the same context.  Plaintiffs maintain that
"comparator" means all the faculty who share a specific faculty
member's codes for rank, tenure status, experience, and market
variable, as reviewed in the Chambers' report.  P. Reply (doc. 315)
at 6.  Using this definition, Plaintiffs argue that, because the
salaries of Plaintiffs Hood, Funk, Jackson and Riskin, after the
1994 adjustments, did not equal that of their "comparator" Lee, the
1994 adjustments did not successfully mitigate the inequity created
by the 1993 adjustments.  Id. at 6-7.

        In contrast, although Defendants' definition of "comparator"
seems to be the same as Plaintiffs', Defendants contend that the
department in which a faculty member taught was also a factor in
determining the 1994 adjustments.  D. Reply & Resp. (doc. 21) at 6-
7.  In light of this procedure, it is clear that Plaintiffs
continued to experience an inequitable salary at NAU after the 1994
adjustments.  The original 1993 adjustments were not based on the
salaries existing within specific departments.  As stated
previously, the raises were based mainly on the Chambers' study,
which utilized only the independent variables of experience, rank,
discipline and tenure status in its faculty salary regression
analysis.  Order (doc. 277) at 11.  Thus, although the 1994
adjustments may have equalized salaries within specific
departments, they could not have placed the Plaintiffs in the
positions they would have occupied but for the discrimination.  See
Albemarle, 422 U.S. at 421.

        If Plaintiffs had received the same treatment as the minority
and female faculty in 1993, they would have received an increase in
pay that equaled their predicted salaries and those of their

1   comparators, as defined in the Chambers' report.  However, the 1994

2   adjustments only raised Plaintiffs' salaries to the point where

3   they were allegedly equalized with their comparators within their

4   academic departments, not their comparators school-wide.  Such a

5   methodology is different from that utilized in regard to the 1993

6   increases and achieves a different result.  The Court concludes

7   that the 1994 adjustments did not successfully mitigate the

8   inequity created by the 1993 Hughes adjustments.

9       Furthermore, the Court disagrees with Defendants' statement

10  that "the Plaintiffs are arguably entitled to the increase, if any,

11  they would have received if NAU had allocated the $207,000 in 1993

12  affirmative action pay increases to 'attain a balance.'"  Mot.

13  (doc. 16) at 7.  Neither party has disclosed a method by which the

14  Court could determine what Plaintiffs would have received if NAU

15  had allocated the $207,000 in 1993 to "attain a balance."

16  Additionally, neither party has produced a calculation that

17  includes "factors that may more fully explain the existence of

18  salary differences such as doctoral status, performance and

19  individual difference."  Order (doc. 277) at 20-21.

20      In any event, although the parties do not dispute that the

21  Chambers' report was flawed, such report was the basis of the 1993

22  Hughes adjustments, which, in turn, was the foundation of the Title

23  VII violation found by the Court.  Order (doc. 277) at 19-20.  In

24  light of this fact, as well as the presumed impossibility of

25  fashioning a mathematical methodology that includes retrospective

26  subjective factors, the Court finds appropriate a calculation of

27  Plaintiffs' damages based on their predicted salaries, determined

28  in the Chambers' report.

1    Although such a resolution may not resolve the discrimination

2  imposed against the affected female faculty, the Court is not

3  currently charged with "fix[ing] an affirmative action plan," as

4  Defendants suggest.  Instead, the Court, in determining an

5  appropriate award of damages, is required to place Plaintiffs in

6  the position they would have been in had NAU not violated Title

7  VII.  See Albermarle, 422 U.S. at 418.  Thus, the Court shall deny

8  Defendants' motion for summary judgment.

9       **b. Plaintiffs' Cross-Motion for Summary Judgment**

10    In their cross-motion for summary judgment, Plaintiffs assert

11  that they are entitled to economic damages as a matter of law.

12  Cross-Mot. (doc. 305) at 12-14.  Specifically, Plaintiffs contend

13  that because this Court previously determined that Defendants

14  violated Title VII, damages must be awarded.  Id. at 12-13.

15          In instances where the Court determines that
            unlawful discrimination has occurred; "back pay
16          should be denied only for reasons, which, if
            applied generally, would not frustrate the central
17          statutory purposes of eradicating discrimination
            throughout the economy and making persons whole
18          for injuries suffered through past
            discrimination."

19

20  Id., citing Albermarle, 422 U.S. at 421.  Plaintiffs assert that

21  the 1994 adjustments failed to remedy the disparity between

22  minority male faculty and non-minority male faculty, and, in some

23  instances, increased the disparity.  Cross-Mot. (doc. 305) at 14.

24  Thus, they encourage the Court to award damages based on

25  Toutkoushian's calculations.  Id.  In addition, Plaintiffs argue

26  that they are entitled to damages because "Dr. Lovett was

27  untruthful to the faculty and to the EEOC." Id. at 14.

28    In their response to Plaintiffs' cross-motion, Defendants

argue, among other things, that summary judgment should not be granted in favor of Plaintiffs because the appropriate amount of damages still remains in dispute. D. Reply and Resp. (doc. 21) at 1. Specifically, Defendants note that both parties have submitted expert witness reports and each expert has reached a different conclusion concerning the amount of damages Plaintiffs incurred. Id. at 1-2. Consequently, Defendants assert that summary judgment on this issue is inappropriate. Id.

Both parties have submitted their own expert's report regarding the damages allegedly incurred by Plaintiffs in this matter.[2] Additionally, both parties agree that their respective experts came to different conclusions regarding the appropriate calculation and amount of damages due to Plaintiffs. However, the issue of which calculation is proper in determining and awarding damages in this case is not analyzed by the parties in their briefs.

Beyond the argument that Plaintiffs should not be allowed to base their damages on the predicted salaries in the Chambers' report, discussed above, Defendants do not fully assert any additional challenges to Toutkoushian's calculation. Defendants note that their expert questions Toutkoushian's disregard of a later salary adjustment that occurred in 1995. D. Reply and Resp. (doc. 21) at 12. However, Defendants do not attempt to demonstrate that Toutkoushian's conclusions about the 1995 increases are incorrect or that Thomas' conclusions are correct.

_____

[2] Plaintiffs submit the original and supplemental reports of Dr. Robert K. Toutkoushian, Ph.D. Exbts. A & B (doc. 306). Defendants submit the report of Dr. Stephanie Thomas, Ph.D. Exbt. D (doc. 306).

1    In her report, Thomas asserts that a second round of equity

2  adjustments occurred in 1995 and, thus, should be included in the

3  Plaintiffs' damages calculations.  Exbt. D (doc. 306) at 5.

4         It is my understanding that a second round of
          equity adjustments was granted on January 1, 1995
5         (hereinafter "second Lovett adjustments"). These
          adjustments were retroactive to July 1, 1994. It
6         is my understanding that NAU contends the "second
          Lovett adjustments" were targeted to remedy any
7         inequities created by the "Hughes adjustments".
          [sic] Under the assumption that these increases
8         were targeted in such a manner, they should be
          taken as an offset to any earnings differentials
9         created by the "Hughes adjustments". [sic]

10  Id.  In response, Toutkoushian asserts that the 1995 adjustments

11  should not be included in the damages calculations, because they

12  were made to "partially address market inequities" and were awarded

13  to all faculty.  Exbt. A (doc. 306) at 2-3.

14        I did not subtract these adjustments from the
          financial damages for the plaintiffs because it is
15        my understanding that the second Lovett
          adjustments were made to partially address market
16        inequities between faculty salaries at NAU and
          peer institutions and not to eliminate the
17        remaining internal salary inequities for the
          plaintiffs resulting from the initial salary
18        adjustments made to minority male faculty in FY94.
          It is also my understanding that the market salary
19        adjustments were awarded to female faculty,
          minority male faculty, and non-minority male
20        faculty.

21  Id.  With no arguments presented by the parties on this issue, the

22  Court is currently unable to resolve this dispute.

23    Additionally, the Court, upon its own review of the parties'

24  expert reports, found another matter that remains unresolved

25  regarding Plaintiffs' damages.  The parties' experts seem to

26  dispute whether it is appropriate to grant a 22 percent increase in

27  salary for the years some Plaintiffs accepted administrative

28  appointments at NAU.  Exbt. D (doc. 306) at 13-14; Exbt. A (doc.

306) at 12.  Both experts concede that they each lack sufficient

information to determine what type of raise a specific Plaintiff

received due to such an event.  Id.  However, lacking this

information, the experts each take a different position on how this

issue should be resolved.   Id.

Toutkoushian asserts that the damages for the Plaintiffs that

worked in administrative roles at NAU should be calculated to

include a salary increase of 22 percent for each of the years the

party served in such a capacity.  Exbt. A (doc. 306) at 12.[3]  He

notes that this is the typical salary increase for such a position.

Id.

> According to the plaintiffs, the stipends for
> administrative appointments are typically set at
> two-ninths of a faculty member's annual
> salary...In my subsequent financial damage
> calculations, I will continue to assume that
> administrative appointments carry with them a 22
> percent salary increase, but will also revise
> these calculations upon review of any new
> information in this matter.

Id.  In contrast, Thomas argues that, due to the lack of specific

information about the Plaintiffs' increases, the damages

calculations should err on the side of caution and not account for

any percentage increase in salary.  Exbt. D (doc. 306) at 13-14.

> It is my understanding that compensation for
> administrative appointments at NAU varies
> considerably across appointments. Some
> appointments carry a flat stipend amount, while
> other appointments provide a percentage of salary
> compensation. For purposes of damages
> calculations, only those appointments paid as a
> percentage of salary should be considered.

---

[3] The Court notes that five out of the forty Plaintiffs held
administrative roles at NAU. Exbt. A (doc. 306) at 12.

1   <u>Id.</u> at 14.   This issue was not raised by either of the parties in

2   their briefs, however the Court concludes that it remains

3   unresolved.

4        Finally, the Court notes that Toutkoushian's report attempts

5   to eliminate any future financial damages to the eighteen

6   Plaintiffs who are still employed by NAU.   Exbt. A (doc. 306) at

7   16.   Specifically, Toutkoushian provides calculations of the cost

8   required to either increase the base salaries of such Plaintiffs,

9   or award them a lump-sum payment.   <u>Id.</u>   In relation to the latter

10  option, Toutkoushian provides three different scenarios where the

11  Plaintiffs retire at either age 65, 70, or 75.   <u>Id.</u>

12       With no argument from either party as to which option is more

13  appropriate, it is unclear to the Court whether the parties have a

14  position on this matter.   Regardless, the Court believes that

15  attempting to determine at what exact age these eighteen Plaintiffs

16  will retire is mere speculation, at best.   Consequently, the Court

17  concludes that the eighteen listed Plaintiffs who are still

18  employed at NAU shall receive an increase in their current salaries

19  and not a lump-sum payment.

20       To grant summary judgment, the Court must determine that the

21  record before it contains "no genuine issue as to any material

22  fact" and, thus, "that the moving party is entitled to judgment as

23  a matter of law."   Fed. R. Civ. P. 56(c).   The Court concludes

24  that, except for the contested status of the 1995 adjustments and

25  the 22 percent increase for administrative positions, genuine

26  issues of material fact do not remain in regard to Plaintiffs'

27  damages.   Thus, the Court shall grant in part and deny in part

28  Plaintiffs' cross-motion for summary judgment.   The cross-motion

1   shall be denied as to the two remaining disputed issues defined

2   above, as well as the final total amount of damages.  Additionally,

3   the Court shall deny Plaintiffs' request for attorneys' fees, as

4   the request was not properly filed in accordance with Local Rule

5   54.2. Plaintiffs' cross-motion shall be granted in all other

6   respects.

7        Therefore,

8        IT IS ORDERED that Defendants' Motion for Summary Judgment

9   (doc. 16 in case number CIV 96-1077 PCT RCB) is DENIED.

10       IT IS FURTHER ORDERED that Plaintiffs' Cross-Motion for

11   Summary Judgment (doc. 305 in case number CIV 95-1313 PCT RCB) is

12   GRANTED in part and DENIED in part, in accordance with this order.

13       IT IS FURTHER ORDERED that, absent either side providing

14   within twenty (20) days of the date of this order competent

15   evidence that would establish actual percentage increases for

16   administrative positions, the judgment for plaintiffs will include

17   a 22% increase for each Plaintiff who occupied an administrative

18   position.

19       IT IS FINALLY ORDERED that, absent a contention by either

20   party that they have competent evidence to establish the purpose of

21   the 1995 adjustments and provides such evidence to the Court within

22   twenty (20) days of the date of this order, the Court shall presume

23   that the "understandings" in both Toutkoushian's and Thomas'

24   reports cannot be established, and, consequently, the 1995

25   adjustments cannot and will not be taken into account in

26    . . .

27

28

1   determining Plaintiffs' damages.

2        DATED this 7th day of June, 2006.

3

4

5   _____

6   Robert C. Broomfield
    Senior United States District Judge

7

8

9   Copies to counsel of record.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28